(158 App. Div. 608.)

WHITNEY v. TERRY & TENCH CO.

(Supreme Court, Appellate Division, First Department.   November 7, 1913.)

1. APPEAL AND ERROR (§ 694*)—RECORD—QUESTIONS PRESENTED FOR REVIEW.

> Where the record shows that at the close of plaintiff's case defendant moved for a nonsuit, which was denied with the suggestion that it be renewed at the close of the evidence, but fails to show any renewal of the motion at the close of the evidence, the question of the sufficiency of the evidence to take the case to the jury is not presented.

> [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2910, 2915; Dec. Dig. § 694.*]

2. NEGLIGENCE (§ 55*) — BUILDINGS AND OTHER STRUCTURES — CONTRACTOR — CARE AS TO LICENSEES.

> A contractor, who was employed by the owner of a building, which had been wrecked by an explosion, to tear down and remove the débris, owed no duty of active diligence to the employé of a plumbing contractor who was merely licensed by the owner to come upon the premises to repair piping under it, but was only bound to use ordinary care in the prosecution of the work.

> [Ed. Note.—For other cases, see Negligence, Cent. Dig. § 68; Dec. Dig. § 55.*]

3. NEGLIGENCE (§ 134*)—ACTIONS—SUFFICIENCY OF EVIDENCE.

> In an action by the employé of a plumbing contractor who, while repairing piping under a building which had been wrecked by an explosion and from which the débris was being removed by defendant, was injured by a piece of concrete falling upon him, evidence *held* insufficient to warrant a verdict attributing negligence to defendant for not anticipating and guarding against the injury.

> [Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 267–270, 272, 273; Dec. Dig. § 134.*]

4. NEGLIGENCE (§ 139*)—INSTRUCTIONS.

> Where plaintiff, a plumber, while repairing piping under a building which was being torn down by defendant under a contract with the owner, was injured when a piece of concrete fell striking an iron beam and was deflected 30 feet, it was error to refuse to charge that, if defendant would not in the exercise of ordinary care have anticipated the accident, it *would not be liable.*

> [Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 371–377; Dec. Dig. § 139.*]

Appeal from Trial Term, New York County.

Action by Frank Whitney against the Terry & Tench Company. Judgment for plaintiff, and defendant appeals. Reversed, and new trial granted.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Charles Capron Marsh, of New York City, for appellant.
James F. Brady, of New York City, for respondent.

LAUGHLIN, J. This is an action to recover damages for personal injuries, alleged to have been sustained by the plaintiff through the negligence of the defendant on the 11th day of January, 1911.

The New York Central & Hudson River Railroad Company's Fiftieth Street power house, at the southwesterly corner of Lexington avenue and Fiftieth street, borough of Manhattan, was in part demolished and so badly shattered and wrecked by an explosion as to render it unsafe and to require its complete demolition. The John Pierce Company was the general contractor for the erection of the Grand Central Terminal Station, and it was given supervising authority over the execution of certain work by other contractors. The architects of the Grand Central Terminal Station gave the Pierce Company a verbal emergency order, confirmed in writing under date of January 3, 1911, to make repairs to piping necessitated by the explosion, and directed that all steam, air, and water lines be restored to their former condition, and that necessary repairs to the plumbing be made. The defendant had been previously employed by the railroad company after the explosion to remove the débris and to completely demolish the building. The order in writing to the Pierce Company contained the following:

"Parties making repairs to the lines underneath the Battery House must confer with Terry & Tench's representative in charge of removing the débris from the building, in order to minimize the danger of accident to workmen."

The firm of Baker, Smith & Co., by whom the plaintiff had been employed in the steam fitting business for 22 years, had the steam fitting and plumbing contract in connection with the erection of the new station, but were required to do their work under the supervision of the Pierce Company. The order was communicated by the receiver of the Pierce Company to Baker, Smith & Co. the next day and in the same form. No formal notice was given by the plaintiff's employer to the defendant, and the only evidence on the subject of conferring with the defendant, as directed in the order for the work, is the testimony of the foreman of Baker, Smith & Co. to the effect that he told one of the foremen of the defendant that he was coming in to repair the pipes, and where to remove the débris from to enable that work to be done, which was corroborated in part by the testimony of one of defendant's foremen and the testimony of Baker, Smith & Co.'s superintendent to the effect that he pointed out his men to a watchman and foreman in the employ of the defendant and directed them "to be careful of them."

The framework of the building was of steel construction, which was reinforced by hollow tile concrete and brick. The building was three stories in height above the level of the street and extended from Lexington avenue westerly about halfway to Park avenue, and rested

on concrete walls, six of which ran northerly and southerly between the easterly and westerly exterior walls, dividing it, at the track level, into seven parts of varying width opening toward the south. The open spaces between these walls are referred to by the plaintiff in his testimony as "bays." The evidence with respect to the width of the building north and south is conflicting. The plaintiff said it was about 18 feet wide, but the evidence adduced by the defendant shows that it was composed of two steel panels of about 18 feet in width each. The plaintiff's testimony is explained by the fact that the panel nearest Fiftieth street had been entirely demolished. Most of the roof had fallen in, but part of it remained standing; and the beams, girders, and columns were bent and twisted and the concrete still adhered to them in many places. The building was dangerous to pedestrians on the adjacent streets and to any one on the premises in or about it. It was therefore necessary to completely demolish and remove it as quickly as possible. A ground plan of the building shows that the 12 tracks ended, or were designed to end, with bumpers and the northerly ends, immediately to the south of the building. Three lines of pipe extended east and west through the walls near the southerly end of the building at the track level. The lower was the air line, and it was at the track level. The one immediately above it was the water line; and above that and about 2½ feet from the track level was the steam line.

The accident occurred on the fourth day the plaintiff was working there. The defendant's employés were engaged in clearing up the wreck and removing the material by wheeling some of it onto cars at the track level and by hoisting the rest with an engine and derrick onto Fiftieth street. The derrick stood on the southerly side of Fiftieth street just west of Lexington avenue. According to this testimony of the plaintiff, the work was prosecuted by the defendant from east to west, and he and a helper, in doing their work, followed the cleaning gang employed by the defendant. The plaintiff testified that on the day of the accident the defendant's employés had finished removing the débris from the three easterly bays, and the material from above them, and were working on and over the fifth bay, from 30 to 60 feet to the west. One gang of the defendant's employés were working on the second floor knocking cement off the iron girders and columns with sledges; and another gang of 35 or 40 men were engaged in filling buckets with material at the track level, and it was being hoisted and swung to the street. At the time of the accident the plaintiff had sent his helper upstairs for a piece of flange connection. A water line had fallen down where the plaintiff was working, and he lifted it into place and blocked it up over the air line with a piece of joist, and was walking out of the bay to the south on, or standing on, a plank runway constructed to enable the defendant's men to wheel earth out of the bays onto the cars, and passing over the lines of pipe and extending southerly toward the car track. While in this position, the plaintiff heard a noise as of something falling back of him toward Fiftieth street, and he was struck on the back of the leg and knocked off the runway by a piece of concrete, described as 12 or 13 inches long and wide and 6 inches thick, and weighing about 20 or 25 pounds. It fell in the bay

inside the line of pipe just northerly of the southerly end of the building. The plaintiff saw, and had observed during all the time he had been working there, the work which was being done by the employés of the defendant. He says that concrete was constantly falling about 25 or 30 feet from where he had been working, but that he considered it perfectly safe, because the men who were loosening the concrete were some 30 feet distant from where he was.

The uncontroverted evidence shows that the defendant caused wire screens about 5 feet square to be erected around the columns under the place where its employés were loosening and dropping cement, and that there was such a screen underneath where the pieces of cement in question were cut loose and dropped. There was no wire screen immediately over plaintiff at the time, but there were screens around the columns near him. There is a conflict in the evidence as to whether the derrick was moving material at the time, and as to whether the cement fell from the bucket of the derrick or was dropped by the men working above; but the uncontroverted evidence shows, and the court charged the jury:

"That from whatever source or place the piece of concrete which hit the plaintiff fell, it struck an iron beam and was in this way deflected from its course, so that it struck the plaintiff at a point between twenty-five and thirty-five feet to one side."

The evidence also shows that in the manner in which the work was being conducted by the defendant's employés the bucket of the derrick did not come nearer than 30 feet to a line perpendicular to the place where the plaintiff was working. The evidence on the part of the defendant, which was uncontroverted excepting by the testimony of one witness who thought the cement fell from the bucket of the derrick, and evidently, as counsel for plaintiff virtually concedes, was mistaken, shows that defendant's employés cut this cement loose with a view to letting it drop at a point where it would strike at least 30 feet distant from where plaintiff was. The evidence on the part of defendant also shows that it had two or more watchmen stationed to give warning when material was about to fall, and that such warning was given by shouting, "Look out below!" a minute before the cement dropped. The plaintiff testified that he did not hear the signal or any such signal that day. Evidence was adduced on the part of the defendant tending to show that it posted notices of warning of danger at different places about the premises, and in the vicinity of where the plaintiff was working, and that it was not aware that any employés of Baker, Smith & Co. were working on the premises, and supposed that the men working there were in the employ of the railroad company, and that it had protested to the railroad company against its permitting its employés to work there, owing to the danger involved. There is, however, evidence tending to show that one of the defendant's foremen knew that the plaintiff was working for Baker, Smith & Co., and that he had been given orders to do any laboring work required in the prosecution of the work which the defendant was doing.

[1] At the close of the plaintiff's case, a motion was made for a nonsuit, and denied with a suggestion that it be renewed at the close of

the evidence. At the close of the evidence given in rebuttal, counsel for the defendant started to renew his motion for a dismissal of the complaint, but there had been some question with respect to his having reserved the right to call another witness, and the court interrupted him with an inquiry concerning that, and he was permitted to call the witness; and the record fails to show that there was any attempt to renew the motion thereafter. In this state of the record we are without authority to grant final judgment for the dismissal of the complaint, and therefore the question as to whether the evidence was sufficient to take the case to the jury is not, strictly speaking, before us for a decision. The defendant's motion for a new trial, however, presents the question as to whether the verdict should be permitted to stand. We deem it extremely doubtful whether there was any evidence of negligence on the part of the defendant, and it is quite clear that a finding that it was negligence cannot be sustained.

[2, 3] The defendant was lawfully on the premises, engaged in the prosecution of contract work with the owner. The owner thereupon, at most, licensed the defendant's employés to go upon the premises and prosecute the work for which they were employed, subject, however, to the prosecution of the work by defendant. The defendant was not obliged to suspend its work. The defendant owed no duty of active vigilance to the plaintiff; at most, it was only obliged to exercise ordinary care in the prosecution of its work, and, if there was any risk of injury from the prosecution of the work in that manner, the plaintiff, in accepting employment and working where he did, took the risk of such injury upon himself. There is no evidence of any specific negligent act on the part of any employé of the defendant. It is true the cement was allowed to fall, but it cannot be said that that was not a reasonable manner in which to perform the work for which the defendant was employed. The evidence on the part of the plaintiff tends to show, as already stated, that there was no wire screen immediately over him; but, if so, he knew that as well as did the defendant, and whatever danger was involved, from the manner in which this accident happened, was as well known to him as to the employés of the defendant. The material was not falling where he was, and he considered it perfectly safe, because, as he put it, he was "30 feet from where these things were falling," and for that reason he testified "it was safe, as safe as I am here in the chair." Negligence should not be imputed to the employés of the defendant for not considering it dangerous and taking other measures to prevent the accident. If it is not for us to say now, as matter of law, that it should not have been foreseen by the defendant, in the exercise of reasonable care, that a piece of cement of this size and weight on being dropped from a height of 40 feet or less would, on striking an obstruction 10 or 11 feet below the point from which it was dropped, be deflected 30 feet and hit plaintiff, it is at least competent for us to say that a verdict attributing negligence to the defendant for failing to foresee such an accident is against the weight of the evidence.

[4] The verdict of the jury may be accounted for owing to certain errors in the charge. The learned court instructed the jury with respect

to the negligence of the defendant in general terms, stating that it was its duty to exercise ordinary care, and that that was such care as a reasonably prudent person would be expected to use and would use un-der the same conditions "and with the same dangers reasonably to be apprehended, to look for and to guard against." The court was requested, in effect, to instruct the jury that if they believed that the defendant would not, in the exercise of ordinary care, have anticipated that such an accident would occur, then the plaintiff could not recover, and that, if the defendant "took all reasonable precautions to prevent any accident that might reasonably be anticipated, the plaintiff cannot recover." These requests should have been granted, for they presented the vital question, if there was a question for the jury, pointedly, and that was whether the defendant should have anticipated and guarded against such an accident.

It follows therefore that the judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.

(158 App. Div. 568.)

In re SWAN et al.

Appeal of BURDEN et al.

(Supreme Court, Appellate Division, First Department.   November 7, 1913.)

1. EXECUTORS AND ADMINISTRATORS (§ 122*) — TEMPORARY ADMINISTRATOR — CONTROL BY COURT.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 494–495½; Dec. Dig. § 122.*]

2. COSTS (§ 58*)—POWER TO ALLOW.

In a proceeding by attorneys to compel payment of a claim for services rendered and disbursements made to the committee of an incompetent person, which incompetent died pending the proceeding, the Supreme Court had power to allow costs.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 28, 29; Dec. Dig. § 58.*]

Appeal from Special Term, New York County.

Proceeding by Joseph R. Swan and others, attorneys at law, to compel payment of a claim for services and disbursements against the com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes